UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EDWARD L. WATKINS,

                Petitioner,                        Case Number 20-12964
                                                            Honorable David M. Lawson

v.

LES PARISH,

                Respondent.

_____/

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

A jury convicted petitioner Edward L. Watkins of first-degree murder, assault and a firearms violation for his role in a drive-by shooting in Detroit, Michigan.  After an unsuccessful round of appeals in the Michigan courts, he filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, arguing that the trial testimony identifying him as the perpetrator was the product of an unnecessarily suggestive pretrial identification procedure and that he was deprived of the effective assistance of trial counsel.  Because the state court rejection of these claims was consistent with federal law as determined by the Supreme Court, the petition will be denied.

I.

Watkins was charged for his participation in a May 15, 2015 drive-by shooting that resulted in the death of an innocent bystander, Paige Walker, and gunshot injuries to the intended targets, Montez Gantz and Terry Williams.  The prosecutor's theory was that Watkins and co-defendant Robby Taylor targeted rival gang members Gantz and Williams in retaliation for an earlier shooting incident during which Taylor and another man, Kenneth Burnett, were shot.

- 1 -

A number of individuals who were at the scene on May 15 provided eyewitness accounts of the shooting.  One of the victims, Terry Williams, testified at trial that he did not see who shot him, but he admitted that he made a statement to the police shortly after the incident that identified Williams and Taylor as the shooters.  Shortly after he made that statement, the police showed Williams three different photo arrays, each with a different photo of petitioner Watkins.  He identified Watkins's photo in the third array.  Watkins moved to suppress the identification before trial, but the trial court denied the motion.

Watkins and Taylor were tried twice. The first trial ended in a mistrial after the jury was unable to reach a verdict.  Between the two trials, police seized an assault rifle from Burnett that was later determined to have been used in the shooting.

At the second trial, Detroit Police Detective Lawrence Mitchell testified regarding the investigation of the earlier shooting.  Neither Taylor nor Burnett would provide police with much detail about who shot them.  However, text messages subsequently recovered from Taylor's and Watkins's cell phones suggested that the two men planned to seek revenge against Gantz for the earlier shooting.  There was also cell phone activity between Watkins and Burnett.

Dayna McCrary testified that on May 15, 2015, she drove to her mother's house on Gallagher Street in Detroit to pick up her daughter.  She stopped briefly to speak with her son Oscar, who was visiting outside the house with Gantz, Williams, and Walker.  As she drove away, McCrary saw a van driving up the street, and then she saw gunshots being fired from the van.  McCrary's car was hit by bullets.  She returned to her mother's house, where Walker, who had been shot, was loaded into her car.  McCrary rushed Walker to the hospital, but doctors were unable to save her.

- 2 -

Montez Gantz testified that he and his friend Vito drove separately from Terry Williams's residence to a house on Gallagher to be with their friend Oscar.  Gantz and Vito were standing on the driveway, Williams was seated in his car, and Oscar and Walker were seated in Walker's car.  The group was drinking and listening to music.  A short time later, Gantz saw a white van drive up, and then he saw and heard gunfire coming from the van.  Gantz was hit in the arms, but he testified that did not see who was inside the van.

Days after the shooting, police located a stolen burnt-out white van.  Bullet casings matching those found at the scene of the shooting were recovered from the van.

Terry Williams testified that he was sitting in his parked car on Gallagher when he saw a van approach.  Someone started shooting from the van, but Williams testified at trial that he did not see who was firing.  Williams was struck multiple times by bullets, and Gantz drove him to the hospital.  Williams used an alias when he arrived at the hospital.

Williams admitted that he told a detective at the hospital that "Boss Man TZ," which was Taylor's street name, was driving the van, and that "Savage," which was Watkins' street name, fired shots with an assault rifle from the open sliding passenger door.  He admitted that the police did not provide him with the names "Boss Man TZ" or "Savage," and that he was the one who gave those names to the police.  Williams repeated his identification of the perpetrators under oath to a prosecutor about a week later, and he testified at the preliminary examination that Watkins was the shooter and Taylor was the driver.  But at trial, Williams testified that those prior statements were lies, and that he did not see who was in the van.  Williams also acknowledged identifying people at the various photo lineups, but he said at trial that he lied to police when he picked out Taylor and Watkins' photos.

- 3 -

Williams explained that he felt threatened and coerced into identifying the defendants because the police said that they were going to involve his parole officer.  The prosecutor attempted to impeach this statement by confronting Williams with a text message that he sent to a detective indicating that he was worried that the defendants' friends would hurt him if he continued to cooperate.

Detroit Police Sargent Todd Eby testified that he spoke with Williams at the hospital about a week after the shooting when he emerged from a coma.  Williams provided Eby with the street names of the perpetrators.  He also provided a written statement.  From there, Eby was able to determine the legal identities of the suspects by searching social media.

Detroit Police Sargent Derrick Griffin testified that he was involved in conducting the photo lineups with Williams.  Williams identified Taylor immediately in the first photo array, but he could not identify Watkins in the first two arrays.  The first photo array contained an old photo of Watkins from when he was 16 years old — the only one Griffin was able to locate at the time.  Williams picked out two "filler" photos in the first array.  Griffin then looked for a more recent photo of Watkins, and he found a black-and-white photo of him when he was 18 years old.  Griffin put together a second array a few hours later containing six black-and-white photos that included the newer picture of Watkins, but Williams did not identify anyone.  About a week later, after Watkins was arrested, police used the new booking photo depicting Watkins at his current age of 21 years old in a third lineup.  Williams wrote "Savage" next to Watkins' photo, and he identified him as the shooter.

An expert in cell phone data analysis testified regarding calls made and received on Watkins' phone.  Cell tower data showed that Watkins's phone was used in the sector where the

- 4 -

shooting occurred minutes before the shooting.   Another call was made 48 minutes after the shooting from a different sector.   Watkins' phone was also present in the sector where the burnt-out van was later found.   The records further revealed cell phone communications between Taylor's and Watkins's phones.

At the end of the third trial day, it was brought to the court's attention that spectators in the back of the courtroom were "eyeballing" jurors.   The court spoke to the jury and defendants, and it admonished the conduct of the spectators.   The court was not inclined to entertain a motion for mistrial based on the incident.   The following morning, another juror informed the court about an interaction he had with a spectator in the bathroom during a break on the previous day.   The spectator had asked the juror whether he thought the trial was going "up or down."   The second incident occurred before the court had admonished the spectators.   Defense counsel did not move for a mistrial after learning about the second incident.

The jury found both Watkins and Taylor guilty of first-degree murder and two counts of assault with intent to commit murder.   Watkins was also found guilty of possessing a firearm during the commission of a felony.

Watkins was sentenced to life in prison without parole for first-degree murder and lesser term-of years sentences on the other crimes.   He filed a claim of appeal.   Appellate counsel filed a motion to remand the case to the trial court for an evidentiary hearing on a claim of ineffective assistance of counsel.   The motion asserted that trial counsel was ineffective by (1) failing to move for separate trials or separate juries, (2) failing to object to the admission of evidence regarding the prior shooting, and (3) failing to investigate and call Kyle Greenlaw as an alibi witness.   The Michigan Court of Appeals denied the motion for remand.

Appellate counsel then filed a brief on appeal that raised three appellate issues:

I. The Defendant-Appellant is entitled to a new trial where the trial court erred in not suppressing a line-up identification and where this error led to Mr. Watkins being denied his constitutional right to a fair trial.

II. The Defendant-Appellant is entitled to a new trial where trial counsel was ineffective for not moving for a separate trial or separate jury from the co-defendant and where trial counsel failed to object to certain evidence and failed to call an alibi witness.

III. Mr. Watkins is entitled to a new trial where he received ineffective assistance of counsel when trial counsel did not move for a mistrial and that this affected his constitutional right to a fair trial.

(Brief on Appeal, ECF No. 7-39, PageID.3817.)

The Michigan Court of Appeals affirmed in an unpublished opinion. *People v. Watkins*, No. 340906, 2019 WL 4389160 (Mich. Ct. App. Sept. 12, 2019). The Michigan Supreme Court denied leave to appeal. *People v. Watkins*, 941 N.W.2d 372 (Mich. 2020) (table).

Watkins then filed his habeas corpus petition without the assistance of a lawyer. He raises these same claims in this Court.

## II.

Certain provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering an application for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). A federal court may grant relief only if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United

States," or if the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

"Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quotation marks and citations omitted). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). The distinction between mere error and an objectively unreasonable application of Supreme Court precedent creates a substantially higher threshold for obtaining relief than *de novo* review. Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (quotation marks omitted)).

### A.

Watkins first argues that the trial court erred when it denied his motion to suppress evidence that Williams identified him as the shooter in the third photo lineup procedure. Watkins contends that the inclusion of a photo of him in each of the lineups, when each of the other individuals were included in only one array, unnecessarily suggested to Williams that he should pick Watkins as the shooter.

When denying the motion to suppress the identification, the trial judge acknowledged that submitting three different photographs of Watkins for Williams to see in three different arrays was suggestive, but it was not unduly so.  He found that obtaining more recent photos of Watkins was a good reason for the procedure the police employed.  The Michigan Court of Appeals agreed with those conclusions.  It stated that the reliability of eyewitness identification need not be judicially examined when there was no improper law enforcement activity, and the procedures were not unnecessarily suggestive.  *Watkins*, 2019 WL 4389160 at *3.  It concluded that neither occurred here, and the three-array "pretrial identification procedure was the result of practical investigatory limitations."  *Ibid.*  Ultimately, the court found that "[u]nder the totality of the circumstances in the case at bar, the photographic array procedure utilized by the police did not lead to a substantial likelihood of misidentification."  *Id.* at *3-4.

These holdings did not contravene or unreasonably apply federal law.  The Due Process Clause requires suppression of eyewitness identification evidence only "when law enforcement officers use an identification procedure that is both suggestive and unnecessary."  *Perry v. New Hampshire*, 565 U.S. 228, 241 n.6 (2012) (quoting *Manson v. Braithwaite*, 432 U.S. 98, 114 (1977)).  A pretrial identification procedure violates due process where: (1) the identification procedure is impermissibly suggestive; and (2) the suggestive procedure gives rise to a very substantial likelihood of misidentification.  *Neil v. Biggers*, 409 U.S. 188, 197-98 (1972); *Manson*, 432 U.S. at 99 (holding that due process challenges to identification procedures are reviewed using the *Biggers* test).  The evil to be avoided is that an initial improper identification procedure will result in misidentification at trial and will unduly influence later investigation.  *United States v. Wade*, 388 U.S. 218, 229 (1967).

- 8 -

A criminal defendant has the initial burden of proving that an identification procedure used by law enforcement during the investigation was impermissibly suggestive. It is only after a defendant meets that burden that the court must require the state to prove that the identification was reliable, independent of the suggestive identification procedure. *Id.* at 240 n.31. If a defendant fails to show that the identification procedures were impermissibly suggestive, or if the totality of the circumstances indicates that the identification is otherwise reliable, no due process violation has occurred. As long as there is no substantial likelihood of misidentification, it is for the jury to determine the ultimate weight to be given to the identification. *See United States v. Hill*, 967 F.2d 226, 230 (6th Cir. 1992).

Even when there is undue suggestibility in a pretrial identification process, suppression is not called for if the in-court identification is reliable. "The factors affecting reliability include 'the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.'" *Sexton v. Beaudreaux*, --- U.S. ---, 138 S. Ct. 2555, 2559 (2018) (quoting *Manson*, 432 U.S. at 114); *see also Perry*, 565 U.S. at 239; *Biggers*, 409 U.S. at 199-200.

The prosecutor appropriately conceded on direct appeal that there is a suggestive element to the three-array procedure used by the police. Each six-photo array contained a different and more recent photo of Watkins, but no other individual appeared in more than one array. Assuming Williams was able to discern that the three photos of Watkins (taken when he was 16, 18, and 21 years old) were all of the same person, and further assuming that he detected that the fifteen other

photos depicted fifteen separate individuals, there would have been a degree of suggestiveness in the procedure employed.

The suggestiveness, however, was not so pronounced as to lead to the likelihood of misidentification. The three photo arrays appear in the record. (ECF No. 7-39, PageID.3862-69.) The first array contained six color photos. The second contained six black-and-white photos and was shown to Williams several hours later. The third array of color photos was shown to Williams six days after the first two, following Watkins' arrest. Although the three photos were taken of Watkins at different ages, among the three arrays there were fifteen photos of fifteen other young men of roughly similar appearance. It would not have been as obvious to Williams, or anyone else, as Watkins claims, that Watkins was the only individual who was depicted in all three arrays. A more difficult problem might arise if Williams were shown all three arrays at the same time, and if he had an opportunity to compare them side-by-side. But there was a gap of hours between the first and second procedure, and several days elapsed between the second and third procedure. Under those circumstances, the procedure used was not highly suggestive.

The state appellate court reasonably found that the three-array procedure was not *unnecessarily* suggestive because it was not part of a deliberate tactic to suggest Watkins as the perpetrator. The record supports the state court's conclusion that the successive lineups were the logical product of timing and circumstance. The officer in charge of the case attempted to speak with Williams at the hospital in the earlier morning hours after the night of the shooting, but he was already in a medically induced coma. Instead, he spoke with Williams about a week later. During that initial interview, Williams identified the driver of the van as "Boss Man TZ," and he identified the shooter as "Savage."

- 10 -

Using social media, officers ascertained that Taylor used the moniker "Boss Man TZ," and they saw that Taylor referred to Watkins on social media as "Savage." This information allowed police to put together the first photo array that was shown to Williams on May 21, 2015. The only photo police had of Watkins at the time, however, was one of Watkins when he was 16 years old. Williams picked out two "filler" photographs of other individuals in the first array. Officers then located a black-and-white photo taken when Watkins was 18 years old, and they showed it to Williams that evening in another six-photo array. The officers used a different set of five filler photographs because they were concerned that if they used the same ones, it would be obvious to Williams that Watkins' photo was the only one that changed. Williams did not identify anyone in the second array. Finally, after Watkins was arrested on May 27, 2015, police obtained a current photo of Watkins, which was used in the third photo array. Williams identified Watkins' photo as the shooter, and he wrote "Savage" next to Watkins' photo.

Based on this record, it was objectively reasonable for the state appellate court to find that the pretrial identification procedure employed here was not unnecessarily suggestive. It was fair to infer from the course of the investigation that police did not aim to suggest Watkins as the suspect, but that they put together successive lineups each time they located a more recent photo of Watkins. Although there was an element of suggestiveness, the procedure was not part of a deliberate tactic by police to compel Williams to identify Watkins.

Even if Watkins could have established that the three-array procedure was unnecessarily suggestive, the state court reasonably found under the totality of the circumstances that there was no substantial likelihood of misidentification. Williams was not asked to identify a stranger. He testified at trial that he was the one who gave the police the name "Savage" as the shooter. He

recognized "Savage" as someone from the "Turn-Around Gang" in his neighborhood.  This prior identification by street name allowed the state appellate court to find that there was a sufficiently strong independent indication of reliability that outweighed any aspect of suggestiveness in the photo identification procedure.  There is no basis to upset that finding here.

B.

Watkins argues that he was denied the right to effective assistance of counsel, identifying four instances where his trial attorney performed deficiently: 1) failing to move for a separate trial or a separate jury, 2) failing to object to the evidence that Taylor was motivated to retaliate against Williams and Gantz for the first shooting, 3) failing to call Kyle Greenlaw as an alibi witness, and 4) failing to move for a mistrial after the incidents between the trial spectators and jurors.  The Michigan Court of Appeals rejected each of these claims after finding that Watkins "failed to rebut the strong presumptions that his trial counsel performed effectively and employed reasonable trial strategy." *Watkins*, 2019 WL 4389160, at *4.

The Sixth Amendment guarantees a criminal defendant the right to the effective assistance of competent counsel.  An ineffective assistance of counsel claim has two components.  A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688.  The petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.* at 687.  "Judicial scrutiny of counsel's performance must be highly deferential."  *Id.* at 689.  The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead

- 12 -

[has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688) (quotation marks omitted). And where the challenged conduct amounts to legitimate trial strategy, habeas courts will not find that counsel performed deficiently. *Robins v. Fortner*, 698 F.3d 317, 337-38 (6th Cir. 2012).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Unless a defendant demonstrates both deficient performance and prejudice, "it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

Success on ineffective-assistance-of-counsel claims is relatively rare, because the *Strickland* standard is "'difficult to meet.'" *White v. Woodall*, 572 U.S. at 419 (quoting *Metrish v. Lancaster*, 569 U.S. 351, 357-58 (2013)). Under AEDPA, the standard for obtaining relief under *Strickland* is very difficult to meet because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (internal citations and quotation marks omitted). This doubly-deferential standard requires the Court to give "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013). "[T]he question is not whether counsel's actions were reasonable," but whether "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

- 13 -

1.

The Michigan Court of appeals found no deficient performance when trial counsel did not move for a separate trial or a separate jury, reasoning that counsel may have reasonably decided in favor of a joint trial and jury because the case against Taylor was stronger, which could give the jury an opportunity to acquit Watkins while still holding someone responsible for the crime. *Watkins*, 2019 WL 4389160, *5. That rationale is consistent with federal law.

The state court reasoned properly that the case against Taylor was stronger than the case against Watkins because Taylor — who actually was shot in the earlier encounter — had the more direct motive to seek revenge against Gantz, and Williams identified Taylor, but not Watkins, at the first photo lineup procedure at the hospital. The second shooting resulted in the tragic death of Paige Walker, an innocent bystander. Giving the jury the option of holding Taylor responsible for her death, while acquitting Watkins based on the perceived comparative weaknesses in the case against him, might have been the result of a professionally competent tactical decision.

The decision to move for severance in this case easily can be categorized as trial strategy. Federal habeas courts do not second-guess judgments of that sort. *See White*, 572 U.S. at 420; *Strickland*, 466 U.S. at 689 (cautioning that "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy'") (citation omitted).

Watkins counters that the failure to move for severance exposed him to evidence that might not have been admissible against him, namely the proof of the first shooting, which furnished Taylor's revenge motive. That is a fair point, since counsel's strategic choices must be reasonable.

- 14 -

*Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); *Wiggins*, 539 U.S. at 521.  But that argument breaks down when one considers the likelihood that the evidence of motive was shared by both Taylor and Watkins and was admissible against each of them.

Two days after the April 17 shooting, Taylor and Watkins engaged in the following text exchange:

> Taylor: An call Kya [Burnett] he just found out we're one of them niggas stay.
> Watkins: Alrighty . . . good looking oh and by the way only me moe dre doe and B and juice man off that shit idk bout these other niggas.
> Watkins: Yeah we found out where one stay to 12 mile and Utica.
> Taylor: Yea I already kno fuck it doe. I love yall got me I love you lil bro.
> Watkins: Love you to bro I got you on everything.
> Taylor:  I kno I wont Tez [Gantz] terry and Ike my self I wanna see them fall my self.
> Watkins: Dont worry bro you just gotta chill and heal right now.
> Watkins: Lol that's I call these niggas nemo but they bouta feel some hot shit.

Trial Exhibit 326, ECF No. 7-39, PageID.3950-51.  Then, right after the May 15 shooting, Taylor and Watkins' phones were used for the following messages:

> Watkins: Am I my brothers keeper.!!! Yes I am Yes I am.
> Taylor: ???????
> Watkins: ?? Bouta pop a bottle good Hennessey.
> Taylor: Yup that's how you do it.
> Watkins: Yup see you tomorrow B.

Trial Exhibit 326, ECF No. 7-39, PageID.3951.

This evidence, which suggests a joint motive on behalf of Taylor and Watkins for the shooting stemming from the earlier incident, undermines Watkins' claim that evidence of the earlier shooting incident was not admissible against him.  After he was shot, Taylor let Watkins know that he wanted to see Gantz "fall."  Watkins told Taylor not to worry, to focus on recovering, and that the perpetrators of the first shooting were about to "feel some hot shit."  Watkins' trial

- 15 -

counsel did not perform deficiently by not moving for a separate trial or a separate jury based on the theory that the motive evidence was not admissible against Watkins.

2.

The state court of appeals found that Watkins abandoned the claim that defense counsel should have moved to exclude evidence regarding the earlier shooting of Taylor, because Watkins provided no legal theory as to why the evidence was inadmissible against him. *Watkins*, 2019 WL 4389160, *5 ("Without explaining how an objection would have, or at least could have, been successful, Watkins cannot demonstrate that trial counsel performed below an objective standard of reasonableness by failing to object to the admission of the contested evidence."). That holding properly applied governing federal law. The text messages recounted above established that Watkins acted in concert with Taylor to retaliate for the first shooting. That evidence was relevant and admissible to establish Watkins' motive. Trial counsel was not ineffective by not making a meritless objection. *See Mahdi v. Bagley*, 522 F.3d 631, 638 (6th Cir. 2008).

3.

Watkins argues that his trial attorney was ineffective by failing to call an alibi witness, Kyle Greenlaw. The Michigan Court of Appeals rejected the claim because the statement by Greenlaw demonstrated that he was not available to testify, since he had an outstanding warrant against him. *Watkins*, 2019 WL 4389160, *5 ("Greenlaw's affidavit goes on to explain that he did not testify at either of Watkins's two trials because he 'had an outstanding warrant for CCW.' In other words, the affidavit establishes that Greenlaw was previously unwilling to testify."). The court explained that even if trial counsel could have compelled Greenlaw's attendance by

- 16 -

subpoena, there was doubt over whether he would cooperate when brought to court "against his will." *Ibid.*

Federal law requires that defense counsel conduct a reasonable investigation into the facts of a defendant's case or make a reasonable determination that such investigation is unnecessary. *Wiggins*, 539 U.S. at 522-23; *Strickland*, 466 U.S. at 691; *Stewart v Wolfenbarger*, 468 F.3d 338, 356 (6th Cir. 2007). The duty to investigate "includes the obligation to investigate all witnesses who may have information concerning . . . guilt or innocence." *Towns v Smith*, 395 F.3d 251, 258 (6th Cir. 2005). On the other hand, decisions about what evidence to present and whether to call certain witnesses are presumed to be matters of trial strategy. When making strategic decisions, counsel's conduct must be reasonable. *Flores-Ortega*, 528 U.S. at 481; *see also Wiggins*, 539 U.S. at 522-23. The failure to call witnesses or present other evidence constitutes ineffective assistance of counsel only when it deprives a defendant of a substantial defense. *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002).

The state court faithfully applied these principles. Greenlaw's affidavit, proffered to the state courts on direct appeal, establishes that he was not willing or available to testify at the time of trial. ECF No. 7-39, PageID.3881 ("I did not testify in Mr. Watkins two trials because I had an outstanding warrant for CCW."). Moreover, the affidavit states that Greenlaw was with Watkins at the time of the shooting, but it does not state where they were or who else was with them. Counsel cannot be deemed ineffective counsel by failing to investigate and present alibi witnesses where the record established that "these witnesses were unavailable or would not cooperate with counsel at the time of pre-trial preparation." *Coe v. Bell*, 161 F.3d 320, 342 (6th Cir. 1998)

- 17 -

(holding that counsel was not ineffective for failing to investigate and present alibi witnesses where the record established that "these witnesses were unavailable or would not cooperate with counsel at the time of pre-trial preparation."); *see also Whitlock v. Dretke*, 129 F. App'x 880, 881 (5th Cir. 2005) (holding that state court's decision denying an ineffective assistance of counsel claim did not involve an unreasonable application of *Strickland* where potential alibi witnesses were either unavailable to testify or their testimony would not have supported petitioner's alibi).

4.

Watkins asserts that his trial attorney should have moved for a mistrial following the incidents between trial spectators and jurors. The Michigan Court of Appeals found that the decision not to move for a mistrial did not constitute deficient performance because it might have been the result of a tactical decision. The court reasoned:

> Finally, Watkins argues that trial counsel performed ineffectively by failing to move for a mistrial "when it became apparent that the jury was tainted and possibly prejudiced" as a result of the in-court intimidation tactics and White's out-of-court conversation with one of the jurors. Watkins's argument presupposes that the only reasonable conclusion for trial counsel to have reached was that the attempts to intimidate or influence the jury had biased the jury against defendants. But that is not so. Given the gang-violence overtones of this case, a reasonable trial attorney might just as well have decided not to move for a mistrial because the spectators' attempts to intimidate the jury might have been successful. In other words, counsel might have reasonably believed that it was more likely that the intimidation tactics would work against at least one juror than it was that those tactics would prejudice the entire jury pool to vote against convicting Watkins. Therefore, Watkins has failed to rebut the strong presumption that his trial counsel employed effective strategy in deciding not to move for a mistrial.

*Watkins*, 2019 WL 4389160, *6.

That is not a rationale that the Court can approve. The idea that acquiescing to juror intimidation can be a valid and effective defense strategy is not a reasonable application of any

federal law that the Court is aware of, and the court of appeals's tacit approval of that notion is quite disturbing. At least one justice of the Michigan Supreme Court agrees:

> This hypothesis about defense counsel's motives is unsupported and unnecessary. Whether to move for a mistrial is generally a strategic decision for which counsel is afforded wide latitude. But there is no reason to assume that counsel viewed jury-intimidation efforts to his client's advantage. In my view, such reasoning comes too close to imputing an endorsement of such tactics to defense counsel.

*People v. Watkins*, 941 N.W.2d 372 (Mich. Apr. 21, 2020) (McCormack, C.J., concurring in the order denying leave to appeal).

Nevertheless, the claim is without merit. A trial court has broad discretion to grant or deny a motion for a mistrial, and a mistrial is only warranted upon a showing of manifest necessity. *See Arizona v. Washington*, 434 U.S. 497, 506-10 (1978) (mistrial due to deadlocked jury); *Walls v. Konteh*, 490 F.3d 432, 436 (6th Cir. 2007); *Clemmons v. Sowders*, 34 F.3d 352, 354-55 (6th Cir. 1994). "Manifest necessity" means a "high degree" of necessity. *Arizona*, 434 U.S. at 506. To establish that trial counsel was ineffective by failing to seek a mistrial, the petitioner must show that counsel engaged in unreasonable strategy and that there is a reasonable probability that such a mistrial motion would have been granted. *Delaine v. United States*, 605 F. App'x 468, 471 (6th Cir. 2015).

Neither incident would have compelled the trial court to grant a mistrial out of manifest necessity. On the morning after the first incident, the trial court read the note from the jury that stated, "the big group of people in the back made a few of us uncomfortable eyeballing the jury. Hopefully, they are not returning." ECF No. 7-32, PageID.2416. The trial judge believed that the remarks it made to the jury, spectators, and defendants after it received the note adequately addressed the issue, that fewer spectators were then present, and that the incident was not serious

enough to require questioning of the jurors or to entertain a motion for a mistrial. *Id.* PageID.2417-20. After the court learned of the second incident, it followed up with an on-the-record discussion with the juror. *Id.* at PageID.2472. The juror responded that a spectator had asked him during a break on the previous day whether the trial "was going up or down." *Id.*, PageID.2473. The juror did not know whether party the person was associated with the prosecution or the defense. *Id.*, PageID.2474. The juror stated that though the interaction made him feel uncomfortable, it did not affect his ability to continue as a juror, and that he could still be fair and follow the court's instructions. *Id.*, PageID.2475-77.

On this record, there is no reasonable probability that a motion for a mistrial would have granted. Both incidents occurred before the court addressed the jury, spectators, and defendants. And neither incident involved that sort of outrageous or inherently prejudicial conduct that would have manifestly necessitated a mistrial. The court indicated the matter had not risen to the level requiring a mistrial after it learned of the first incident, and because the second incident occurred before its admonishments, it is unlikely that the court would have entertained a motion for mistrial upon learning about the second minor interaction.

Watkins has not established either element of his ineffective assistance-of-counsel claim. The failure to file a meritless motion or raise a groundless objection does not constitute defective performance. *Jalowiec v. Bradshaw*, 657 F.3d 293, 321-22 (6th Cir. 2011) (stating that an "attorney is not required to raise a non-meritorious claim") (citing *Wilson v. Mitchell*, 498 F.3d 491, 514-15 (6th Cir. 2007)). And because of the substantial unlikelihood that the trial judge would have refused that relief, Watkins cannot show prejudice.

- 20 -

III.

None of the petitioner's claims presents a basis to issue a writ of habeas corpus under 28 U.S.C. § 2254(d).  The state courts' decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts.  The petitioner has not established that he is presently in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   April 21, 2022